IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DUSTIN RAY #F11773                    :

                                  :

    v.                                :   Civil Action No. DKC 13-3480

                                  :

ROBERT KOPPEL, Warden, et al.         :

                                  :

## MEMORANDUM OPINION

Inmate Dustin Ray ("Ray"), proceeding *pro se*, filed an unverified original and supplemental 42 U.S.C. § 1983 Complaint, which relate to his federal detention at the Chesapeake Detention Facility ("CDF").[1]  (ECF Nos. 1 & 9).  In his original Complaint, received for filing on November 19, 2013, Ray provided a laundry list of issues associated with the conditions at CDF, *i.e.*, "overcrowding and totality of living conditions," "no classification policies," "access to the courts," "lack of administrative remedy process," "inadequate staffing," "medical claim," "fire safety," and "ventilation."  (ECF No. 1.)  In his court-ordered supplement, he complains of overcrowded and unsanitary conditions at CDF, a lack of classification policies,

---

[1] At the time he filed his Complaint Ray was confined at the CDF, where he was awaiting trial in this court.  As of December 2013, he was detained at the Howard County Detention Center. (ECF No. 6).  As of July 29, 2014, Ray is confined at the Federal Correctional Institution in Cumberland, Maryland.  (ECF No. 18).  The Clerk shall take all necessary steps to reflect his current Bureau of Prisons' identification number.

access-to-courts issues, a lack of a viable administrative remedy process, an inadequate staffing and screening process, medical problems, insufficient fire safety training, inadequate ventilation, and the failure to protect him from assault. (ECF No. 9).

Ray's Supplemental Complaint expounds on his allegations of unconstitutional overcrowding conditions, claiming that CDF has: limited space, limited access to the toilets, an outdated plumbing system, insect and vermin problems, limited access to programming, poor ventilation, a lack of fire safety instruction, and limited places to eat on old food trays.[2] He further alleges that CDF: limited access to showers and recreation; has inadequate staffing and no careful screening of problematic detainees or classification policies, which caused him to be assaulted on two occasions; has limited access to telephones and an inadequate law library, with little to no access to legal materials; lacks an effective administrative remedy procedure ("ARP") process. Ray also alleges that he received inadequate medical care for a fall, trouble breathing, and chest pain. Ray alleges he experienced physical,

---

[2] Ray complains that due to cracks and holes in the trays, dirty stagnant water would leak onto his food and caused him to get sick on or about November 24, 2013. (ECF No. 9, at 2).

psychological and emotional injuries as a result of these conditions. (ECF No. 9).

Defendants, by their counsel, have filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment with Declarations and exhibits.[3] (ECF No. 27). Ray has filed an Opposition response. (ECF No. 29). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the reasons to follow, Defendants' motion, construed as a motion for summary judgment will be granted and judgment will be entered in their favor.

## I. Background

Defendants assert that CDF was opened in 1988 as a state corrections facility to incarcerate Maryland's most violent inmates and those inmates serving death sentences. (ECF No. 27-5, at 2). In 2010, CDF entered into a "partnership" with the U.S. Marshals Service to house 500 male and female federal pre-trial detainees. Effective March 2011 the CDF was classified as a federal detention facility and its name was officially changed from the Maryland Correctional Adjustment Center to the CDF in February of 2012. (ECF No. 27-15). The CDF is currently used

---

[3] The Complaint against Defendants State Fire Marshal, Secretary of the Department of Human Resources, and Director of Health and Mental Hygiene was dismissed without prejudice. (ECF No. 11, at 2, n.2).

as an intake and receiving institution. Detainees are escorted by the U.S. Marshals Service directly from the federal court house and processed into the facility, fingerprinted, given identification cards, quelled (de-liced), examined by medical/mental health personnel, shown a Prison Rape Elimination Act ("PREA") video, receive an initial phone call, and are then taken to CDF's intake unit until medically cleared to go into general population. (ECF No. 27-5).

CDF has six (6) housing units, an Administration area where the mail room/telephone room is located, and several units including case management, medical and psychological departments. (*Id*.). Federal detainees have access to medical, mental health, and dental treatment with the Department of Public Safety and Correctional Services ("DPSCS"), with a co-pay of $2.00. If the detainee is indigent, the co-pay is waived. Detainees also receive visits and religious services in addition to meals consistent with the DPSCS's approved menu plan, weekly commissary, access to psychological and psychiatric services, and mail privileges consistent with DPSCS Directives. CDF houses Alternative Housing, Segregation, "Separatees", and [General] Population Pre-Trial Detainees. (*Id*.).

Defendants affirm that CDF is audited by the Maryland Commission on Correctional Standards ("MCCS"), which ensures all correctional facilities are operating in accordance with state policies and procedures. (*Id.*).  The Quality Assurance Review ("QAR") ensures the facility operates in accordance with federal, state and departmental policies and procedures.  CDF is accredited by the American Correctional Association ("ACA") and the National Commission on Correctional Health Care ("NCCHC"). (*Id.*).

Defendants maintain that CDF offers a minimum of 17 different programs and activities for detainees including Alcoholics Anonymous (AA), "Celebrate Recovery," "Thinking for a Change," General Education Development ("GED/Pre-GED") programs, correspondence courses and individual self-study programs, and various recreational activities. The main goal of the programs is to provide offenders the opportunity to improve their education level, learn new work and life skills, and begin the treatment process to confront substance abuse.  Defendants note that on a daily basis CDF uses approximately 151 detainees who work in CDF sanitation and maintenance, the dietary area, the Laundry, the Paint Detail shop, or as barbers, hairdressers, clerks, and observation aides.  (ECF No. 27-5).

In 2013, CDF's detainee population consisted of 92% general population, 5% segregation, and 3% female detainees. In 2013, medical staff performed 14,571 examinations, 339,129 pounds of laundry was processed, food service served 482,895 detainee meals, and 34 detainees participated in the GED program. There were 4,462 attorney visits, and 11,527 social visits. In 2013, CDF also received accreditation by the ACA and the NCCHC. (*Id.*).

Ray entered CDF on November 14, 2011 and received and acknowledged receiving the "Federal Detainee Handbook." (ECF Nos. 27-6, 27-9 & 27-10). The U.S. Marshal's report indicated that he did not have any medical conditions. (ECF No. 27-6). On November 18, 2011, Ray completed an intake summary form that indicated that he was never a member of a gang, was comfortable being housed in general population, and had no enemies. (ECF No. 27-8). On July 24, 2012, Ray received a semi-annual detainee classification review. (ECF No. 27-11). There were no known security concerns such as threats from gangs or escape attempts, or housing or psychological issues, and Ray voiced no concerns. Another semi-annual review was conducted on March 8, 2013, with similar results. (*Id.*). Ray expressed an interest

in a job and or program assignment and subsequently volunteered for a dietary job in June of 2013.  (ECF No. 27-12).

On August 16, 2013, a reclassification security assessment instrument was prepared for Ray.  (ECF No. 27-13).  He was classified as medium security and approved for general population.  It was observed that he had no enemies.  Defendants note that on November 26, 2013, Ray was placed on administrative segregation after he was assaulted by another detainee.  A copy of the Notice of Special Confinement was placed in Ray's medical and psychological files and forwarded to Defendant Gamble-Gregg, the Assistant Jail Administrator at the CDF.  (ECF No. 27-14).

MCCS conducted an audit at the CDF from January 30 to February 3, 2012.  MCCS' report, issued on May 24, 2012, found the CDF to be in compliance with the majority of the standards for an adult correctional institution.  (ECF No. 27-15). Approximately 94% of the inmate security and well-being standards were met, 100% of inmate food services, medical, dental and mental health standards were met, and 88% of housing and sanitation standards were met.  (*Id.*).

The CDF also received an audit and an "Acceptable" rating from the U.S. Department of Justice, U.S. Marshals Service, Prisoner's Operations Division, in March of 2013.  The annual

Quality Assurance Review or QAR noted deficiencies in health care, administration and management, security and control, safety and sanitation, programs and services, and workforce integrity. (ECF No. 27-16). It was noted that there was no written classification policy in place that clearly outlined how detainees are classified and housed at CDF. Further, during a fire drill, one designated staff member responded with the wrong emergency keys, and the evacuation plan had not been certified by an independent inspector for 2012. There was also severe water and tile damage to the ceiling. (*Id.*). CDF was given 30 days to submit a corrective action plan detailing remedial action and steps taken and target dates to correct the areas containing deficiencies. (*Id.*).

An additional audit was conducted in December of 2013 by the Commission on Accreditation for Correctional Standards. The audit noted that the CDF's population was under its rated capacity and that security, environmental conditions, fire safety, food service, recreation, and library services met acceptable standards. (ECF No. 27-17). Ray remained housed at the CDF until December 2, 2013. (ECF No. 27-7).

On March 20, 2013, Ray filed an informal inmate complaint alleging that he had trouble breathing and was experiencing

chest pain, which he believed may have been caused by his thyroid condition.  He alleged that a CDF officer told him to file a sick-call slip rather than having him seen immediately. (ECF No. 27-18).  A response issued on April 15, 2013, observed that Ray had been evaluated and was instructed on the sick-call process.  An explanation and clarification of a medical emergency was also provided.

On March 25, 2013, Ray filed two informal complaints.  The first complaint concerned his being terminated from his painting job in December of 2012 and being moved from his cell to another tier in violation of directives governing CDF.  (*Id.*).  A response noted that the sanctions were appropriate.  The second informal complaint involved Ray's alleged fall from a plastic chair during a paint detail on August 24, 2012, and his request for damages.[4]  A March 29, 2013 response advised Ray that the matter had been addressed and that if he wished, he could file an appeal to the Inmate Grievance Office ("IGO").  (*Id.*).  On June 22, 2013, Ray filed three additional informal complaints concerning overcrowding at CDF, access to the law library, and the risk to his health from contagious diseases and violent offenders.  In July and September of 2013, Ray was informed

---

[4] In the informal complaint, Ray acknowledges he was taken to the emergency room at Johns Hopkins Hospital.

that:  (1) the CDF population count was approximately 100 less than capacity; (2) CDF could not accommodate a full-sized library due to its size, but Ray could obtain legal materials by contacting Defendant Gamble-Gregg; and (3) the CDF was in the process of conducting security classifications on all detainees as part of its ACA accreditation goal.  (ECF No. 27-18).

On August 5, 2013, Ray filed an informal complaint regarding extreme heat and lack of adequate ventilation and complained that he was unable to breathe and sleep at night.  He requested a loaner fan because he could not afford to purchase one.  On August 18, 2013, Ray was advised that he needed to submit documentation from the medical department indicating that he had breathing problems and that he must show a zero balance in his account before a "loaner fan" could be issued.  (*Id.*).

In his unverified Opposition, Ray maintains that the conditions at the CDF involve "tight" living quarters that do not lend itself as a holding facility for pre-trial detainees as the dayroom area has limited hygiene facilities, *i.e.* toilets, showers, and sinks.  (ECF No. 29).  Ray further states that there is very limited access to available programming.  He argues that the lack of a classification policy to monitor and manage problematic detainees, as shown by the audits,

contributed to alleged overcrowding and poor living conditions. Ray alleges that it is well documented that Defendants had first-hand knowledge of many concerns and problems concerning health care, administration and management, security and services, and work force integrity.  He asserts that Defendants have only submitted "biased" audits. (*Id.*).

## II.  Standard of Review

Defendants have moved to dismiss, or in the alternative, for summary judgment.  Ordinarily, a court cannot consider matters outside the pleadings or resolve factual disputes when ruling on a Rule 12(b)(6) motion to dismiss. *See Bosiger v. U.S. Airways,* 510 F.3d 442, 450 (4th Cir. 2007).  If the court does consider matters outside the pleadings, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed.R.Civ.P. 12(d); *see also Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp.,* 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the

supporting extraneous materials."). It is appropriate to consider the extraneous materials submitted by Defendants, and Plaintiff had notice by virtue of the motion filed by Defendants. *See Warner v. Quilo*, No. ELH-12-248, 2012 WL 3065358, at *2 (D.Md. July 26, 2012) ("When the movant expressly captions its motion 'in the alternative' as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur[.]") (quoting *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998)). Accordingly, Defendants' motion will be construed as one for summary judgment.

Summary judgment is appropriate under Federal Rule of Civil Procedure Rule 56(a) when there is no genuine dispute as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Id.* at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405 (4th Cir. 2005).  The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson,* 477 U.S. at 252.

A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted). Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt,* 999 F.2d 774, 778-79 (4th Cir. 1993)

(quoting *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987)).

Finally, while courts generally should hold *pro se* pleadings "to less stringent standards than formal pleadings drafted by lawyers," they may nevertheless dismiss complaints that lack a cognizable legal theory or that fail to allege sufficient facts under a cognizable legal theory. *Haines v. Kerner,* 404 U.S. 519, 520 (1972); *Turner v. Kight,* 192 F.Supp.2d 391, 398 (D.Md. 2002). A federal court must liberally construe pleadings filed by self-represented litigants to allow them fully to develop potentially meritorious cases. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007). This court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party, particularly when that party is self-represented. *See Scott v. Harris,* 550 U.S. 372, 378 (2007); *Gordon v. Leek,* 574 F.2d 1147, 1151 (4th Cir. 1978).

## III. Analysis

The Complaint is filed pursuant to 42 U.S.C. § 1983, which "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver,* 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)). A suit under § 1983

14

allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 707 (1999). To state a claim under § 1983, a plaintiff must allege that: (1) a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

Defendants assert that Ray's claims are subject to dismissal under Rule 12(b)(6) and/or subject to adverse judgment under Rule 56 on the chief grounds of no personal participation, *respondeat superior*, failure to demonstrate a violation of his First, Fourteenth and Eighth Amendments, and qualified immunity. The court shall address Ray's multiple issues.

### A. Injunctive Relief

It is possible for events subsequent to the filing of the complaint to make an injunctive relief request moot. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). This is so even though such a case presented a justiciable controversy at an earlier point in time and an intervening event rendered the controversy moot. *See Calderon v. Moore*, 518 U.S. 149, 150 (1996). Indeed, "[w]here on the face of the record it appears

15

that the only concrete interest in the controversy has terminated, reasonable caution is needed to be sure that mooted litigation is not pressed forward, and unnecessary juridical pronouncements on even constitutional issues obtained." *See Lewis v. Continental Bank* Corp, 494 U.S. 472, 480 (1990).

To the extent that Ray seeks injunctive relief, the claim for relief was mooted when he was transferred out of CDF in December of 2013. No equitable relief may be granted.

**B. Conditions of Confinement**

Confinement conditions of pretrial detainees are to be evaluated under the Due Process Clause rather than under the Eighth Amendment.[5] *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *Hill v. Nicodemus,* 979 F.2d 987, 990 (4th Cir. 1992). Although a convicted inmate must prove that his confinement is cruel and unusual punishment, detainees need only prove that their confinement amounts to punishment in order to state a claim. *See Nelson v. Collins,* 659 F.2d 420, 425 (4th Cir. 1981). To establish that a particular condition or restriction of detention constitutes impermissible punishment, a detainee must

_____

[5] As a practical matter, however, at the present time courts do not distinguish between the Eighth and Fourteenth Amendments in the context of a pre-trial detainee's Section 1983 claim on these issues. *See Hill v. Nicodemus,* 979 F.2d 987, 990-92 (4th Cir. 1992). *But see, Kinsley v. Hendrickson,* 135 S.Ct. 2466, 2476 (2015) (noting that excessive force claims may be subject to a different standard for pre-trial as opposed to sentenced detainees).

show either (1) an expressed intent to punish or (2) a lack of a reasonable relationship to a legitimate governmental non-punitive purpose. *See Wolfish,* 441 U.S. at 538; *Martin v. Gentile,* 849 F.2d 863, 870 (4th Cir. 1988). The state must justify conditions of confinement on the basis of ensuring the detainee's presence at trial and effectively managing the detention facility. *See Wolfish,* 441 U.S. at 540. Further, the detainee must show he suffered an actual injury from the conditions at issue. *See Strickler v. Waters*, 989 F.2d 1375, 1382 (4th Cir. 1993).

The court, after an examination of the record, finds that Ray has failed to demonstrate that the conditions to which he was exposed constituted punishment and that he experienced injury directly related to those conditions.

### C. Prison Programming

While prison employment may serve an important rehabilitative function, the law is well settled that a prisoner has no constitutional right to participate in an educational or rehabilitative program. *See Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (due process clause not implicated by prisoner classification and eligibility for rehabilitative programs, even where prisoner suffers "grievous loss"); *Bulger v. United States Bureau of Prisons,* 65 F.3d 48, 49 (5th Cir. 1995) ("Prisoner classification and eligibility for rehabilitation programs . . .

17

are not directly subject to 'due process' protections") (citing *Moody*, 429 U.S. at 88 n9). Ray was afforded a job in the dietary department and acknowledges working on a paint detail at the CDF. He, however, had no constitutionally protected liberty interest in those positions; thus, his removal from his job did not implicate a constitutionally protected right, as is necessary to maintain a due process claim. Under the analytical framework which the Supreme Court set out in *Sandin v. Conner,* 515 U.S. 472 (1995), termination from a prison job is not an atypical or significant hardship in relation to the ordinary incidents or prison life, and so no constitutionally protected liberty interest was infringed. *Id*. at 485.

**D. Access to Courts**

Ray complains about his limited access to the telephone, the adequacy of the CDF law library and his access to legal materials. Inmates are entitled to "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Bounds v. Smith*, 430 U.S. 817, 825 (1977); *see also Hudspeth v. Figgins*, 584 F.2d 1345, 1347 (4th Cir. 1978). In 1996, the Supreme Court clarified the *Bounds* decision by finding that a deprivation of a prisoner's right of access to the courts is actionable, but only when the prisoner is able to demonstrate actual injury from such

deprivation.  *See Lewis v. Casey*, 518 U.S. 343, 349 (1996).
According to the *Lewis* opinion, the Constitution does not
guarantee inmates the ability to litigate every imaginable claim
they can perceive, only that they be given the tools necessary
"in order to attack their sentences, directly or collaterally,
and in order to challenge the conditions of their confinement."
*Id*. at 355.

Ray was represented by court-appointed counsel in his
federal criminal case.[6]  Further, there is no dispute that he had
access to the CDF law library and, to the extent that he needed
additional legal materials, he could request them from the
Assistant Jail Administrator at the CDF.  He raises a
generalized, speculative claim that the limited access to legal
materials affected his criminal trial.  Ray has, however, failed
to show real injury from the alleged deprivation.

**E. Medical Care**

Ray alleges that he received inadequate medical care
following a fall from a chair and for trouble breathing and
chest pain.  To establish a claim of this nature Ray must
satisfy an objective and a subjective requirement.  First, he
must satisfy the "objective" component by illustrating a serious

---

[6] *See United States v Ray*, Criminal No. WDQ-11-619 (D.Md.).

medical need.[7]  *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998); *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).  The Fourth Circuit has held that "[t]here can be no claim against the officers for inadequate medical care when there exists no objective evidence that [the detainee] even has a serious need for such attention." *Belcher v. Oliver,* 898 F.2d 32, 35 (4th Cir. 1990).  If Ray proves this first element, he must then prove the second subjective component of the Eighth Amendment standard by showing deliberate indifference on the part of defendants.  *See Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (holding that claims alleging inadequate medical care are subject to the "deliberate indifference" standard outlined in *Estelle*, 429 U.S. at 105-06).  "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of

---

[7] A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Iko v. Shreve*, 535 F.3d at 241, citing to *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999); *see also Gobert v. Caldwell*, 463 F.3d 339, 345 n. 12 (5th Cir. 2006), *citing Hill v. Dekalb Reg. Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994); *see also Monmouth County Correctional Inst. Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir. 1987); *Creech v. Nguyen*, 153 F.3d 719, 1998 WL 486354, at *5 (4th Cir. 1998).

causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Defendants "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference." *Id*. at 837. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter…becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) (quoting *Farmer,* 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844.

Ray has failed to demonstrate that Defendants were deliberately indifferent to a serious medical need. At his intake he made no mention of medical issues. His own record shows that the same date he fell from a plastic chair he was taken to the Johns Hopkins Hospital emergency room for

examination and treatment.   Further, the record shows that each time he filed an informal complaint regarding a medical problem, CDF personnel responded with an explanation or noted that Ray had been evaluated.   Finally, Ray has failed to show that the named defendants had any direct personal involvement in or interfered with his receipt of medical care.   Liability on the part of supervisory defendants requires a showing that:   "(1) the supervisory defendants failed promptly to provide an inmate with needed medical care, (2) that the supervisory defendants deliberately interfered with the prison doctors' performance, or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations."   *Miltier v. Beorn*, 896 F. 2d 848, 854 (4th Cir. 1990) (citations omitted).   There is no showing that Defendants had actual or constructive knowledge that medical staff were ignoring Ray's complaints and that any denial of care posed "a pervasive and unreasonable risk" of constitutional injury to Ray.   Defendants are entitled to rely on the medical expertise of trained health care professionals.

**F. Failure to Protect**

Ray contends he was subject to an assault in November of 2013, and attributes the attack to inadequate staffing and

classification or screening of "problematic" detainees.  Upon his arrival at the CDF, Ray's intake indicated he had no gang affiliation or enemies and that he would be comfortable in general population.  Subsequent semi-annual reviews reiterated these findings.  Ray's November 24, 2013 assault, reported to CDF staff, resulted in his assignment to a more secure housing unit (administrative segregation).  Even if pre-trial detainees, parole violators, and convicted felons were housed together at CDF, there would not be a sufficient basis from which to infer deliberate indifference.  Administrators in many states are unable to house each inmate only with those of a similar status. Ray has provided no evidence whatsoever that the absence of a prisoner classification system or insufficient CDF staffing contributed to inmate violence.

### G. Administrative Remedy Process

Ray complains about the adequacy of the grievance and complaint process at CDF.  His claim fails to set out a colorable constitutional claim.  The law in this Circuit dictates that no constitutional entitlement to grievance procedures or access to such procedures is created merely because such procedures are voluntarily established by a state. *See Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).

**IV. CONCLUSION**

Having found no genuine dispute of material fact justifying a trial on the merits in this case, Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, construed as a motion for summary judgment, shall be granted.[8] A separate order will follow.


Date: August 31, 2015                    _____/s/_____
                                         DEBORAH K. CHASANOW
                                         United States District Judge

---

[8] In light of the absence of a constitutional deprivation, the court sees no need to address Defendants' qualified immunity argument.

24